## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NOURA SHARABASH,

        Plaintiff,

        v.

ADVOCATE HEALTH AND
HOSPITALS CORPORATION,

        Defendant.

No. 23-cv-00359

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

Dr. Noura Sharabash, a former gastroenterology hospitalist at Advocate Health and Hospitals Corp. ("Advocate") and Plaintiff in this employment discrimination case, alleges that Defendant failed to accommodate her pregnancy-related conditions in violation of Illinois law, discriminated against her based on pregnancy and religion in violation of Title VII and the Illinois Human Rights Act (IHRA), and retaliated against her for taking leave under the Family and Medical Leave Act (FMLA). After a period of discovery, Defendant Advocate has moved for summary judgment on all counts. (Dkt. 27.) For the following reasons, Defendant's motion for summary judgment is granted.

## I.    BACKGROUND

Plaintiff worked as one of two gastroenterology ("GI") hospitalist physicians in her group at Advocate Medical Group (part of Advocate Health). (Dkt. 32 ¶¶ 8, 14, 21.) Plaintiff's direct supervisor was Dr. Chintan Mistry, the head of the GI

hospitalist practice. (Dkt. 37 ¶ 13, 35.) Another individual, Linda Gant-Farley, handled scheduling and administrative matters affecting Plaintiff's group. (Dkt. 37 ¶¶ 28–30.) Plaintiff was the only Muslim physician in her group. (*Id.* ¶ 64.) Plaintiff was generally considered a good physician, and there is no suggestion in the record of performance deficiencies unrelated to the leave requests discussed below. (Dkt. 41 ¶ 3.)

In the first half of 2021, Dr. Mistry accommodated Plaintiff's needs to balance work and family. For example, Mistry allowed Plaintiff a modified schedule so she could supervise her children during that period. (Dkt. 37 ¶ 25.) Plaintiff herself testified that she "liked Dr. Mistry" and appreciated that he was understanding and supportive. (*Id.* ¶ 60.)

In late 2021, Plaintiff became pregnant. (*Id.* ¶ 26.) Around October 15, 2021, Plaintiff went on leave due to pregnancy-related medical issues. (*Id.* ¶ 27.) Plaintiff was briefly hospitalized around that time. (*Id.*) Plaintiff had intended to continue working in some capacity, and in November 2021, she sought to return to work on light duty or with restrictions (while still pregnant). (*Id.* ¶ 28, 32–33.) Plaintiff's role as a GI hospitalist primarily required in-person inpatient care, but her personal medical restrictions did not allow in-person case. (*Id.* ¶ 29, 34.) Defendant states that accommodating Plaintiff's request was challenging because it was a "significant departure" from her normal duties. (*Id.* ¶ 38.) Advocate took some time to find alternative work for Plaintiff to do remotely. (*Id.* ¶ 39.) In the interim, Advocate kept her on paid short-term disability leave and counted the time against her FMLA

entitlement. (*Id.* ¶ 42.) By early December 2021, Advocate had identified some remote administrative or research tasks for Plaintiff, which allowed her to do limited work until her baby's birth. (*Id.* ¶ 43.) Plaintiff gave birth in mid-January 2022. (*Id.* ¶ 44.)

After delivering her child on January 15, 2022, Plaintiff took maternity leave. (Dkt. 37 ¶ 45.) Advocate provided a total of twenty-four weeks of leave related to Plaintiff's pregnancy and childbirth, combining FMLA leave, personal medical leave, and paid parental leave. (*Id.* ¶¶ 31, 33, 39, 42–43, 45, 50.) This included the time off from mid-October 2021 through Plaintiff's delivery and recovery. By early 2022 (after her delivery), Plaintiff had used most or all of her twelve weeks of FMLA entitlement (the record reflects she did not "lose" any FMLA leave—she received the full amount to which she was entitled). (*Id.*) Advocate also provided additional paid parental leave beyond FMLA, and a short personal medical leave, totaling just under six months (twenty-four weeks) of leave in all. (*Id.*)

It appears that Plaintiff's FMLA leave was set to expire in early April 2022 (April 7, 2022). (Dkt. 37 ¶ 50.) Before her leave was over, Plaintiff sought even more time off. In late December 2021, while on leave, Plaintiff had a phone call with Dr. Mistry and Linda Gant-Farley in which she inquired about taking an additional personal leave of absence beyond her FMLA entitlement. (*Id.* ¶ 69.) After Dr. Mistry left that call, Gant-Farley allegedly raised her voice and would not let Plaintiff speak. (*Id.*)

On February 4, 2022, Plaintiff formally emailed Gant-Farley requesting an unpaid personal leave of absence from April 8, 2022 to August 1, 2022 (approximately

3

90 days beyond her FMLA leave). (Dkt. 37 ¶ 51.) Plaintiff's request was not framed as a medical necessity; rather, it was a general personal leave request. (*Id.* ¶ 54.) Plaintiff admits she chose to request a "personal" leave instead of a medical leave because she did not want to deal with additional MetLife disability paperwork and did not want colleagues to know about certain health issues she was experiencing. (*Id.*) At the time, Plaintiff believed her health would improve on its own and that she would be able to return after a few more months of rest. (*Id.*) Plaintiff also had lingering breathing issues from a COVID-19 infection in January 2022, but she did not inform Advocate of that; indeed, "no one at Advocate knew" she had tested positive for COVID on January 3, 2022. (*Id.* ¶ 61.)

On February 7, 2022, Gant-Farley responded by email that the 90-day leave could not be approved and that Plaintiff was needed back at work on April 8, 2022 (when her existing leave ended). (Dkt. 37 ¶ 62.) That decision was made in consultation with Dr. Mistry and Dr. Bone. (*Id.* ¶ 53.) Dr. Mistry and the other GI physicians in the group unanimously agreed that extending Plaintiff's absence another three months would impose an undue strain on the practice. (*Id.*) Since October 15, 2021, the group's other GI doctors had been covering all of Plaintiff's duties—a period of almost six months by April 2022. (*Id.*) Dr. Mistry (and perhaps Dr. Bone) therefore denied the request for an extended personal leave. (*Id.*)

After learning that no further leave would be approved, Plaintiff decided to resign. (Dkt. 41 ¶ 24.) Plaintiff's employment agreement required 90 days' notice for a voluntary resignation without cause. (Dkt. 37 ¶ 56.) On March 30, 2022, she

4

submitted a letter of resignation to Advocate's President (with copies to Mistry, Bone, Gant-Farley, and others). (*Id.*) In that letter, she gave the contractually required 90-day notice, specifying an effective termination date of June 28, 2022. (*Id.*) Plaintiff's stated reason for resigning was "family reasons." (*Id.*) She did not mention any need for a medical accommodation or any allegation of discrimination in the resignation letter. (*Id.*)

On April 5, 2022, Dr. Mistry replied, accepting her resignation and confirming that her last day would be June 28, 2022. (Dkt. 37 ¶ 57.) Mistry stated the understanding that Plaintiff would return to work on April 8, 2022 in her normal role and continue working through the 90-day notice period. (*Id.*) Essentially, Advocate expected her to resume active employment as of April 8 and work for the next three months until her resignation date.

At that point, however, Plaintiff did not feel physically capable of resuming full duties. In the days following her resignation notice, she communicated to Advocate that she was unable to return to full-time in-person work for health reasons. (Dkt. 37 ¶ 58.) This was the first time Plaintiff explicitly told the employer that her request for extended leave was health-related. (Dkt. 37 ¶ 51, 54, 61.) In particular, on April 6, after initially indicating she would return, Plaintiff asked if her last day could be moved up (so that she would not have to return to work) and stated it was due to health issues. (*Id.*)

Upon learning this, Advocate (through Dr. Mistry) promptly advised Plaintiff to apply for a formal medical leave of absence if she was medically unable to work;

that step would ensure that she would not breach her contract by failing to return. (Dkt. 37 ¶ 59.) Plaintiff then applied for a medical leave. (*Id.* ¶ 62.) On April 9, 2022, she visited her primary care physician, reporting shortness of breath (possibly related to her earlier COVID infection). (*Id.* ¶ 61.) Although diagnostic tests yielded mostly normal results, Plaintiff's doctor provided a note recommending that she work from home due to these health complaints. (*Id.* ¶ 62.) Advocate then granted Dr. Plaintiff a personal medical leave starting April 8, 2022 (coinciding with the date when she otherwise would have had to return to work). That medical leave covered approximately five weeks (until May 12, 2022). (*Id.* ¶ 49, 62.) After May 12, 2022, even though Plaintiff's formal leave had expired, Advocate did not require her to return to work for the remainder of her notice period. This meant that Plaintiff was effectively on unpaid leave until her employment ended on June 28, 2022. (*Id.* ¶ 62.)

In sum, once Plaintiff made her health issues known, Advocate relieved her of her work duties during the notice period and allowed her to remain off of work. By August 2022 (after her resignation was effective), Plaintiff felt that her health had improved enough that she "for sure" could have returned to in-person work, but by then she was no longer employed with Advocate. (*Id.* ¶ 63.)

Plaintiff then brought suit alleging six counts: failure to accommodate pregnancy conditions under the Illinois Human Rights Act ("IHRA") (Count I); pregnancy discrimination under Title VII and the IHRA (Count II and Count III, respectively); religious discrimination under Title VII and the IHRA (Count IV and Count V); and retaliation under the Family and Medical Leave Act ("FMLA") (Count

6

VI). In her response to Defendant's summary judgment motion, Plaintiff voluntarily withdrew Count I and Count VI as untimely. (Dkt. 36 at 8 n.2.) Accordingly, those claims are no longer contested, and the Court may treat the summary judgment motion on Counts I and VI as unopposed. Plaintiff opposes Defendant's motion for summary judgment as to Counts II through V.

## II.  STANDARD OF REVIEW

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted).

## III.   DISCUSSION

### A.   Plaintiff has Abandoned Count I and Count VI

Plaintiff expressly abandoned both counts in opposing summary judgment, which the Court treats as waiver. (Dkt. 36 at 8 n.2); *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1063 (7th Cir. 2020). Count I is independently time-barred to the extent it rests on October–November 2021 events because her charge was filed on October 21, 2022, limiting actionable conduct to December 25, 2021 forward. (Dkt. 33 at 5–6) (citing *Henry v. Ford Motor Co.*, No. 22 C 4528, 2023 WL 4492388, at *2 (N.D. Ill. Jul. 12, 2023) (IHRA); *Serir v. Cmty. Coll. Dist. No. 514*, No. 21-2696, 2022 WL 807864, at *2 (7th Cir. Mar. 16, 2022) (nonprecedential disposition) (Title VII)).

As to Count VI, the record defeats causation: Advocate approved Plaintiff's FMLA, personal medical, and paid parental leaves (roughly twenty-four weeks total), which undercuts any inference of retaliatory animus. And the single disputed decision—the denial of an additional 90-day personal leave—was consistently explained by the burden it would place on the small GI-hospitalist group which had covered her role already for nearly six months; Plaintiff offers no evidence of pretext. (Dkt. 33 at 5–6) (citing *Gallagher v. Dart*, No. 17 C 8028, 2020 WL 1164499, at *6 (N.D. Ill. Mar. 11, 2020); *Burton v. Bd. of Regents*, 851 F.3d 690, 697 (7th Cir. 2017)).

Accordingly, Defendant is entitled to summary judgment as to Count I and Count VI.

### B.   Because Plaintiff Does Not Present Evidence of an Adverse Action, Defendant Is Entitled to Summary Judgment on Count II and Count III

Plaintiff alleges Defendant discriminated "because of" pregnancy or childbirth

by denying her requested leave configuration in early 2022, which forced Plaintiff to resign (constructive discharge). (Dkt. 36 at 7.) Count II arises under Title VII's Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k); Count III is the Illinois Human Rights Act (IHRA) analogue which is governed by the same standards as Title VII. (Dkt. 36 at 7 n.3.) At issue is whether Plaintiff suffered a materially adverse employment action and, if so, whether a reasonable jury could find that pregnancy or childbirth was the but-for cause of that action. *See Williams v. Waste Mgmt., of Ill., Inc.*, 361 F.3d 1021, 1034 (7th Cir. 2004) (plaintiff was not constructively discharged and therefore did not suffer an adverse employment action).

At summary judgment, a plaintiff can succeed by providing either direct evidence of discriminatory intent or by using the indirect *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Ultimately, however, the Seventh Circuit instructs that "all evidence belongs in a single pile" and the key question is whether "a reasonable factfinder [could] conclude that [the plaintiff's pregnancy]" was the but-for cause of any of the decisions made regarding her employment. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). Accordingly, the evidence is considered as a whole to determine whether unlawful discrimination motivated the adverse employment action.

Under the *McDonnell Douglas* approach, the Plaintiff must first establish a prima facie case by showing: (1) she is a member of a protected class (here, pregnant or recently pregnant women); (2) she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly

9

situated employees outside the protected class were treated more favorably. 411 U.S. 792, 802 (1973). If the prima facie case is made, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. If the employer clears that hurdle, the burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802, 804. Pretext means more than just a bad or erroneous business decision; it requires a showing that the employer's reason is a lie or phony explanation to cover up discrimination. *Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 640 (7th Cir. 2001).

A threshold issue in this case is identifying an adverse employment action. Title VII of the Civil Rights Act of 1964, makes it unlawful to discriminate "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." Prohibited actions include discharge, discrimination in pay, denial of promotion, demotion, harsher discipline, suspensions, and forced leave. *Reives v. Illinois State Police*, 29 F.4th 887, 894 (7th Cir. 2022). Along with adverse actions, Title VII bars harassment because of sex: that is, harsh treatment severe or pervasive enough to alter the employee's terms and conditions of employment. *Id.*

Not every inconvenience or denial of an employee's preference is actionable. An adverse action must be a materially adverse change in the terms or conditions of employment such as termination, discipline, or loss of pay that is significant enough to change the terms, conditions, or privileges of employment. *Id.* Consequently,

regardless of whether this Court uses *McDonnell Douglas* or the holistic *Ortiz* approach, a pregnancy discrimination plaintiff must establish a materially adverse employment action. *Id.* at 891.

Plaintiff alleges that she was constructively discharged—*i.e.*, that the circumstances forced her to resign—after she was denied certain accommodations.[1] A constructive discharge, if proven, is treated as a termination and thus an adverse employment action. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004). But the standard for constructive discharge is high: a plaintiff must show that her working conditions had become so intolerable that a reasonable person in her position would feel compelled to resign immediately. *Id.* This usually requires egregious harassment or a threat of imminent firing. *Id.*

Constructive discharge is reserved for extraordinary cases where discriminatory or retaliatory conditions are so objectively intolerable that a reasonable person would feel compelled to resign, or where the employer communicates that termination is imminent. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004). The Seventh Circuit recognizes these two paths and applies them strictly. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008); *Chapin v. Fort Rohr Motors, Inc.*, 621 F.3d 673, 679–680 (7th Cir. 2010). And the Seventh Circuit has repeatedly affirmed summary judgment where the record shows neither unbearable conditions nor any communication suggesting that discharge is a foregone

---

[1] As Defendant notes (Dkt. 40 at 4), Plaintiff effectively narrowed her theory to constructive discharge. In her response in opposition, Plaintiff did not meaningfully assert that denial of a preferred leave configuration, a post-call scheduling dispute, or slight bonus timing matters amounted to actionable adversity.

conclusion. *See Fields v. Board of Education of the City of Chicago*, 928 F.3d 622, 625–27 (7th Cir. 2019); *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009).

Based on the summary judgment record here, a finding of constructive discharge would be unreasonable. To begin, nothing in the record suggests that Defendant told Plaintiff she would be fired or penalized if she did not return on April 8, 2022. Defendant simply denied additional discretionary unpaid leave beyond what had already been provided. (Dkt. 37 ¶ 52–53.) Plaintiff still had a job available to her. In fact, when she indicated she could not return for health reasons, Defendant facilitated Plaintiff's medical leave. (*Id.* ¶ 59.)

Moreover, at the time she resigned (March 30, 2022), Plaintiff had been cleared by her doctor of any pregnancy-related medical restrictions. (*Id.* ¶ 46.) There is no evidence Defendant knew Plaintiff had ongoing medical issues in late March. (*Id.* ¶ 61.) Plaintiff did not communicate her hand pain or breathing difficulties at that time. (*Id.*) From Defendant's perspective, therefore, Plaintiff was able to return to work. (*Id.*) Requiring an employee to return to work after a lengthy leave is not objectively intolerable treatment—it is a fundamental expectation for any job. *Myers v. Sunman-Dearborn Cmty. Schs.*, 142 F.4th 527, 535 (7th Cir. 2025) (employee's working conditions "do not become intolerable or unbearable merely because a prospect of discharge lurks in the background.") (citations omitted).

Plaintiff argues she "had no choice" but to resign because she felt she could not safely return in April and her leave was denied. (Dkt. 36 at 13.) As the undisputed evidence shows, however, Plaintiff did have an option short of quitting: she could have

12

requested a medical accommodation or extension (supported by documentation). In fact, only after resigning did Plaintiff request a medical leave, a request that Defendant promptly granted. (Dkt. 37 ¶¶ 59–62.) Had Plaintiff pursued that route initially, it appears Defendant would have similarly considered it, as it did once Defendant learned of Plaintiff's doctor's note.

In any event, Plaintiff does not cite to record evidence that could reasonably support a finding that prohibited harassment or animus spurred Defendant to deny Plaintiff's leave request. That decision was driven by staffing needs, not discriminatory behavior toward Plaintiff. (Dkt. 37 ¶ 53.) Dr. Bone's statements that "we needed her back" and concerns about the burden on colleagues reflect a workplace constraint, not harassment. (Dkt. 42 ¶ 22.) Indeed, Dr. Bone specifically cited the strain on the team and the long duration of coverage already provided (since mid-October 2021) as the reason for wanting to post Plaintiff's position or deny her further leave. (*Id.*) Such statements related to work coverage, not to Plaintiff's pregnancy.

Nor were Plaintiff's work conditions upon her return extremely abusive or so unsafe as to render her job objectively intolerable; Defendant simply expected Plaintiff to resume her normal duties and schedule (including her share of on-call weekends). (Dkt. 37 ¶¶ 23, 49, 57.) As the record reflects, Plaintiff stated her appreciation for how Dr. Mistry had treated her. (*Id.* ¶ 60.) This undermines any claim that Defendant had made Plaintiff's employment unbearable.

In short, no reasonable jury could find that Plaintiff's resignation was a constructive discharge attributable to pregnancy discrimination. A constructive

13

discharge requires a showing of egregious conditions or a threat of immediate firing, neither of which is present here. *Myers*, 142 F.4th at 535. Defendant's actions—accommodating six months of leave and then asking for her return—would not compel a reasonable person to quit; many employees return from leave under such conditions without resigning. *See Christian v. Ill. State Bd. of Educ.*, No. 05 C 2735, 2007 WL 2088735, at \*6 (N.D. Ill. Jul. 19, 2007) ("[A]n employer's refusal to allow an employee to take sick and personal days as . . . she desires does not rise to the level of an adverse action."); *see also Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 648 (7th Cir. 2023) (more difficult for employee to show forced resignation where employee resigns without giving employer a chance to resolve the issue). Plaintiff did not afford Defendant the opportunity to consider a shorter extension, medical leave, or a different role because Plaintiff chose to resign instead of further engaging in an interactive process. For all these reasons, therefore, Plaintiff's constructive discharge theory fails as a matter of law.

### C. Plaintiff's Religious Discrimination Claims Fail for Lack of Adverse Action

In Count IV, Plaintiff alleges that Defendant discriminated against her on the basis of her religion (Islam) in violation of Title VII. Count V is the parallel IHRA religious discrimination claim and, as with pregnancy, the legal analysis for IHRA religious discrimination mirrors Title VII. *See Butler v. Ford Motor Co.*, No. 21 CV 1244, 2023 WL 5720854, at \*5 (N.D. Ill. Sept. 5, 2023). Plaintiff contends that, as the only Muslim in her group, she was treated worse than her colleagues (who were not Muslim), and that this differential treatment caused her constructive discharge. (Dkt.

14

36 at 12.)

To survive summary judgment on religious discrimination, Plaintiff must present evidence from which a reasonable jury could find that her Muslim religion was a motivating factor or but-for cause of an adverse employment action. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). As with pregnancy discrimination, Plaintiff can proceed via direct or indirect proof, but the evidence is viewed in a "single pile." *Id.* at 766. Direct evidence could include derogatory or overtly-biased statements by a decisionmaker about her religion. *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997). Because Plaintiff admits no one at Advocate ever made any derogatory comments about her religion, she lacks such direct evidence. (Dkt. 36 at 12.)

Plaintiff may also rely on circumstantial evidence under the *McDonnell Douglas* framework, or a mosaic of evidence (suspicious timing, ambiguous statements, comparative evidence of systematic better treatment of non-Muslims, etc.). *Ortiz*, 834 F.3d at 766. To proceed under *McDonnell Douglas*, Plaintiff must satisfy the prima facie elements: (1) Plaintiff falls in a protected class; (2) Plaintiff was meeting job expectations; (3) Plaintiff suffered an adverse action; and (4) similarly situated non-Muslim employees were treated more favorably than Plaintiff. *Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1309 (7th Cir. 1997). If Plaintiff makes that showing, Defendant must provide a legitimate, nondiscriminatory reason for its actions; if it does so, Plaintiff must prove that the stated reason is pretextual. *Id.*

15

Plaintiff attempted to tie constructive discharge to religion by claiming she was forced out due to religious discrimination. (Dkt. 36 at 12.) But the evidentiary shortcomings identified above as to Plaintiff's pregnancy-related counts apply here too. If anything, Plaintiff's religious discrimination claim rests on even softer ground. Plaintiff's stated reason for resigning was the leave issue, not anything to do with religion. In fact, nothing in Plaintiff's resignation letter or emails suggests she quit over religious harassment or conflict; she cited family reasons. (Dkt. 37 ¶ 56.) Indeed, the record is devoid of any contemporaneous indication that religious animus pushed Plaintiff out of a job. And a successful constructive-discharge based on religious harassment requires that the hostility have been truly unbearable. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). Plaintiff has not demonstrated any harassment based on her religion that was so severe a reasonable person would feel forced to quit. *Id.*

A review of the summary judgment record supports this finding. There is no evidence that anyone at Advocate made derogatory comments about Plaintiff's religion. That circumstance defeats any argument based on direct evidence of religious discrimination. (Dkt. 36 at 12.) There is also no evidence in the record concerning remarks about Islamic customs. In short, there is nothing in the record showing explicit references to Plaintiff's Muslim identity.

Instead, Plaintiff's case rests on the most tenuous of inferences: Gant-Farley raised her voice at Plaintiff on two separate occasions. The first was an exchange in the summer of 2021 during which Gant-Farley "started almost screaming" while

16

announcing a change to how post-call days would be scheduled. (Dkt. 37 ¶ 66.) And the second was a call in late December 2021 call where Gant-Farley again raised her voice about Plaintiff's request for more time off. (*Id.* ¶ 69.) But in the constructive-discharge context, occasional yelling or a stern tone, without threats, slurs, or sustained harassment based on a protected class, does not approach the "intolerable" environment required to deem a resignation a termination. This is particularly so where (1) Defendant soon after accommodated Plaintiff with remote work (December 2021); and (2) when Plaintiff later reported her medical restrictions, Defendant invited and approved a medical leave rather than insisting on Plaintiff's immediate return to work. *Tutman*, 209 F.3d at 1050 (a "single oblique threat" was insufficient to establish constructive discharge).

In any event, Dr. Mistry, not Gant-Farley, was Plaintiff's direct supervisor and the key decision-maker for important actions (like denying leave). (Dkt. 37 ¶ 66.) There is no evidence or even allegation that Dr. Mistry discriminated against Plaintiff due to religion. As Plaintiff concedes, Dr. Mistry treated Plaintiff kindly and accommodated Plaintiff's needs (modified schedule in early 2021, extended leaves, and Plaintiff's admissions that she "liked Dr. Mistry"). (Dkt. 37 ¶¶ 60.) It would be unreasonable to find that a hostile work environment existed where the employee's direct supervisor (Dr. Mistry) was supportive and an indirect supervisor (Gant-Farley) was hostile on two occasions. Successful hostile work environment claims typically involve frequent or severe discriminatory conduct of a greater significance than that here. *Tutman*, 209 F.3d at 1050. And the standard for constructive

17

discharge is even higher: challenged conduct "must be even more egregious than the high standard for hostile work environment because [] an employee is expected to remain employed while seeking redress." *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (citation omitted). In this case, the evidence reflects two incidents where an indirect manager was harsh toward Plaintiff but without any reference to Plaintiff's religious identity. Those circumstances are insufficient to meet the threshold of severity or pervasiveness required for a hostile work environment theory, let alone constructive discharge. *Id.*

Plaintiff's religious discrimination claims lacks evidence of a cognizable adverse action. Summary judgment is therefore granted to Defendant on Count IV and Count V.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted.

SO ORDERED in No. 23-cv-00359.

Date: March 30, 2026

_____
JOHN F. KNESS
United States District Judge

18